102 P.3d 840 (2004)
STATE of Washington, Respondent,
v.
Simon NOWINSKI, Appellant.
No. 50848-2-I.
Court of Appeals of Washington, Division 1.
December 13, 2004.
*841 Richard Hansen, Cassandra L. Stamm, Allen Hansen & Maybrown PS, Seattle, WA, for Appellant.
Donald J. Raz, Attorney At Law, Seattle, WA, for Respondent.
BECKER, J.
Simon Nowinski was convicted of murder based on statements he made during a police interrogation at which a prosecutor was also present. The statements should have been suppressed under ER 410 because Nowinski had an objectively reasonable belief that he was engaged in plea negotiations when he described his participation in the murder. The error was not harmless and the conviction is reversed.
The murder victim, Daniel Dabalos, was discovered in August 2000 on a wooded embankment in an unpopulated area of King County east of Lake Young. The cause of death was multiple stab wounds to the chest.
Police suspected 20-year-old Simon Nowinski who they knew had been involved with Dabalos in a recent incident of felony flight. When they asked Nowinski if he knew anything about the murder, he denied having anything to do with it. Detectives Sue Peters and Jim Doyon decided to arrest Nowinski on an outstanding warrant. The warrant was for a robbery charge that had once been dismissed but had recently been refiled. They arrested Nowinski in front of his mother's house just after 5 p.m. on October 4, *842 2000. Detective Peters read the Miranda[1] warnings to Nowinski as she drove him down to the Kent Regional Justice Center. The two detectives began to question Nowinski about the robbery, but they soon turned to the murder of Dabalos.
According to the findings of fact entered by the trial court in support of the motion to suppress, the detectives  using cell phone records and gas receipts  had constructed a timeline of the night they believed Dabalos was murdered. They questioned Nowinski for several hours and eventually showed him a gruesome autopsy photograph of the victim. Detective Peters told him that "if something got out of control that night, this was his opportunity to tell the truth."[2] Nowinski, with tears in his eyes, said he had things to tell them, but first he wanted to speak with his girlfriend.
The detectives arranged for Nowinski to speak with his girlfriend. Then at about 11:30 p.m., Detectives Doyon and Peters sat down with Nowinski in a conference room. Prosecutor Dan Raz was also present. According to the testimony of Detective Peters, it was her idea to summon the prosecutor because she felt Nowinski was getting ready to disclose his involvement in the murder. "And basically, Simon said that he wanted to make a deal so he wouldn't have to go to jail for a long time period."[3] Nowinski described the murder, implicating himself along with another person identified by Nowinski as the person who did the stabbing. He repeated his narrative in a tape-recorded statement. Afterwards, Nowinski took the police to the locations where he said clothing had been burned and where the knife used in the stabbing had been thrown into the Green River.
The State charged Nowinski with second degree murder while armed with a deadly weapon. Nowinski moved to suppress or exclude from evidence the statement he gave to the police, as well as the evidence from the burn site and the knife. The trial court denied the motion and found Nowinski guilty on stipulated facts. This appeal followed.

EVIDENCE OF OFFER TO PLEAD GUILTY  ER 410
Nowinski contends that he was engaged in plea negotiations when he described his participation in the murder, and therefore the trial court should have excluded the statement under ER 410. This rule states:
Except as otherwise provided in this rule, evidence of a plea of guilty, later withdrawn, or a plea of nolo contendere, or of an offer to plead guilty or nolo contendere to the crime charged or any other crime, or of statements made in connection with, and relevant to, any of the foregoing pleas or offers, is not admissible in any civil or criminal proceeding against the person who made the plea or offer.[[4]]
The trial court concluded that Nowinski did not have a reasonable expectation that plea negotiations were occurring. Therefore, his statement concerning the death of Dabalos was "not controlled" by ER 410.[5]
Ordinarily, as the State points out, evidentiary rulings are reviewed for a manifest abuse of discretion. State v. Smith, 115 Wash.2d 434, 444, 798 P.2d 1146 (1990). However, no authority has been cited, and our research has disclosed none, for applying this standard of review to a conclusion regarding the applicability of ER 410. Such a ruling is not analogous to a discretionary ruling such as might be made under ER 403 or ER 404(b). The ruling at issue here denied a motion to suppress brought under CrR 3.5, the procedure for admitting confessions, and the court entered findings of fact and conclusions of law. In concluding that plea negotiations were not occurring, the court decided a mixed question of law and fact. This conclusion in turn compelled the *843 court's ultimate ruling that Nowinski's statement was "not controlled" by ER 410. Our review will determine, de novo, whether the trial court derived the proper conclusion from the undisputed findings of fact about what was said during the course of the evening. See State v. Armenta, 134 Wash.2d 1, 9, 948 P.2d 1280 (1997).
In deciding that Nowinski's statements were not made in the course of plea negotiations, the trial court applied a widely-used two-part test stated in United States v. Robertson, 582 F.2d 1356 (5th Cir.1978). The Robertson court considered the admissibility of statements made by a defendant under the corresponding federal evidence rule as it existed in 1978. The federal rule was amended in 1980 to limit its application to discussions with a prosecuting authority. This court achieved substantially the same result by judicial interpretation in State v. Pizzuto, 55 Wash.App. 421, 434, 778 P.2d 42 (1989)(limiting the applicability of ER 410 to "plea negotiations with prosecuting attorneys, or with their agents who possess express authority to plea bargain, and defense counsel or the defendant.").
In Robertson, drug enforcement agents found methamphetamine in a residence, and arrested two men and two women. They took them to an office for processing, and then prepared to drive them to the courthouse for arraignment. While standing in the parking lot, the two men began a discussion with the agents about their involvement in the crime. One of them asked if he could "get his wife off" by co-operating. The arresting agents responded that they couldn't promise anything, but stated that "any cooperation he made would probably help him out in the long run." Robertson, 582 F.2d at 1360. The two men proceeded to describe their involvement with the meth lab while emphasizing that the women were not involved in the operation. The trial court's refusal to exclude their statements was affirmed on appeal against an argument that the defendant believed the statements were plea negotiations and should have been excluded under Fed.R.Evid. 410. The court acknowledged "the accused's assertions concerning his state of mind are critical" in determining whether a discussion should be characterized as a plea negotiation. Robertson, 582 F.2d at 1366. But an objective assessment is also critical because the defendant's subjective perceptions were the only consideration, every confession would be vulnerable to an ER 410 challenge:
The trial court must apply a two-tiered analysis and determine, first, whether the accused exhibited an actual subjective expectation to negotiate a plea at the time of the discussion, and, second, whether the accused's expectation was reasonable given the totality of the objective circumstances.
Robertson, 582 F.2d at 1366.
Applying this analysis to the facts, the Robertson court concluded that the parking lot conversation was not a plea negotiation. The defendants admitted their own complicity in order to exonerate the women. "They did not even contemplate pleading guilty." Robertson, 582 F.2d at 1370.
In the present case, the court found ER 410 at least potentially applicable because Nowinski did not make his inculpating statement until he was in the presence of Prosecuting Attorney Raz. The court concluded from the testimony of Nowinski and the detectives that Nowinski did have an actual subjective expectation to negotiate a plea. However, the court concluded Nowinski's expectation was not objectively reasonable because:
Raz told the defendant that there would be no deal that night and that he needed to take the information the defendant provided back to consult with his boss before making a charging decision. The defendant never inquired about charging possibilities, never offered to plead to any crime and never established the parameters of the interview before confessing. There is insufficient evidence of a quid pro quo. Although the defendant hoped for leniency, objectively there were no plea negotiations.[[6]]
The question for this court is whether the findings of fact support the conclusion that *844 "objectively there were no plea negotiations." According to the court's findings, there was a three-hour period during which Nowinski was interrogated only by the detectives. During this phase of the interview, Nowinski "talked in circles, was evasive, and tried to channel the discussion and limit its scope."[7] The detectives perceived that he wanted to make a deal:
Through the comments and questions of the defendant, the detectives believed that the defendant wanted something in return for his cooperation. The detectives told the defendant that they did not have the authority to make a deal. The defendant himself knew, from prior involvement in the criminal justice system, that only a prosecutor could resolve or "deal" a case. Doyon told the defendant that a prosecutor could be called in to answer any questions, including questions about charging possibilities, and that the defendant's cooperation would result in a benefit to the defendant. The detectives offered to call a prosecutor in to answer the defendant's legal questions concerning charging possibilities such as the time he faced if he cooperated and to define murder one and murder two, and the defendant agreed. The defendant believed the discussion would go beyond simply the facts of the murder but progress to what legal significance his revelation of the facts might have. Detective Peters told the defendant, however, that there would be no deals that night and the prosecutor would listen and evaluate.[[8]]
At this point, the detectives acceded to Nowinski's request for some time to talk to his girlfriend, because they felt this would "further create in his mind a disposition to confess."[9] Nowinski admitted to his girlfriend that he had been involved in the death of Dabalos. He told her that although he did not intend for Dabalos to die, "things did not happen the way they were supposed to." He said the prosecutor "was on his way to work a deal." He told her he "hoped that if he talked to the prosecutor about what happened, the charges would not be as serious, the sentence shorter, and he might even come home that night."[10]
About an hour after Nowinski finished talking with his girlfriend, Prosecutor Raz, along with Detectives Peters and Doyon, sat down with Nowinski in a conference room. Again, Detective Doyon read Nowinski his rights and then introduced Prosecutor Raz to Nowinski. The discussion began:
Raz told Nowinski that he (Raz) was the prosecutor on the case, was there to listen, and would be making the filing decision on the case. When the defendant asked if charges had been filed yet, he was told no. The defendant then asked if a deal could be made now so he wouldn't have to go to jail for a long time. Raz told the defendant there were no deals being made that night and the information the defendant provided would be considered with all the evidence in the case and discussed with Raz's supervisors. Raz acted in good faith. Raz made no offers to the defendant. Nowinski asked no further questions of Raz. He made no offers to plead guilty to any crime. Nowinski did not ask about what possible charges he faced and never established parameters for the statement before confessing. He did not ask for an attorney. The defendant instead described his involvement in the murder of Daniel Dabalos. By virtue of what he described, the defendant engaged in activity that was tantamount to a guilty plea. The defendant held such a strong hope that he would receive leniency that this hope ripened into an actual subjective expectation that he was negotiating a plea at the time of his confession to the prosecutor and detectives.[[11]]
*845 Next, Nowinski agreed to give a tape recorded statement, a process that took about an hour. When the detectives asked him about the felony flight incident that occurred before the murder, he asked that the tape be stopped. He told them he did not want to talk about that incident, and they agreed not to ask about it. The tape was turned back on and the interview resumed. Nowinski acknowledged Raz's disclaimer that there was not going to be a deal that night:
During the taped interview, the defendant acknowledged that Prosecutor Raz had told the defendant that Raz was the prosecutor who would make the charging decision in the case, that Raz wasn't able, at that time, to make any promises or plea bargains with the defendant in regard to that charging decision, that Raz would consider all the evidence that was put together by the investigators, including the defendant's statement, and that this was the defendant's opportunity to tell the police what happened. After the detectives had asked their questions of the defendant, Raz also asked the defendant questions. After the tape statement was completed, Raz had no further contact with the defendant. At no time, from the time of his initial arrest until his ultimate booking in the King County Jail, did the defendant ask for an attorney.[12]
Did these facts establish an objectively reasonable basis for Nowinski's perception that he was engaged in plea negotiations with Prosecutor Raz? In concluding they did not, the trial court relied in part on the fact that Nowinski "never offered to plead to any crime".[13] The State contends that this is an important consideration in deciding whether plea negotiations occurred, citing State v. Pizzuto, 55 Wash.App. 421, 436, 778 P.2d 42 (1989).
In Pizzuto, the defendant  in hopes of avoiding the death penalty  made inculpatory statements to police officers about two murders while he was being held in another state on unrelated charges. We held that ER 410 was inapplicable  because the statements were made to police officers, not to prosecutors  and thus they were properly admitted. The point of Pizzuto is that "plea bargaining is for counsel and investigation for officers. Plea bargaining between unauthorized officers and defendants should not be countenanced". Pizzuto, 55 Wash.App. at 435, 778 P.2d 42. After making this distinction, the court thoroughly reviewed the circumstances of the defendant's statements to assure he had not been misled into believing that the officers to whom he made his statements were authorized to speak for the prosecutor. Because the defendant had been told repeatedly that no promises would be made, the court concluded that when he offered his co-operation he was merely volunteering in the hope he would receive a benefit. The critical fact was that Pizzuto knew the officers had no authority to offer deals, not that he himself did not offer to plead guilty.
The State emphasizes the statement in Pizzuto that plea bargaining "involves a quid pro quo." Pizzuto, 55 Wash.App. at 435, 778 P.2d 42. The trial court in this case concluded there was "insufficient evidence of a quid pro quo."[14] However, again, Pizzuto does not stand for the proposition that one side or the other must actually extend a specific offer.
In a pre-arraignment discussion such as this one where no charges have been filed, the analytical question is whether the negotiations contemplated a guilty plea. United States v. Melina, 868 F.Supp. 1178, 1181 (D.Minn.1994). In Pizzuto the defendant had been told unequivocally there would be no deals. Here, the prosecutor's qualified disclaimer that there were "no deals being made that night"[15] is more consistent with negotiations conducted in contemplation of a guilty plea. As the trial court recognized, it was not objectively reasonable to believe an *846 offer would be extended that night. Detective Peters testified, "when you sit down with a suspect to negotiate a deal, you want to know what they have to say before you're going to make any offers".[16] Before Nowinski made his statement, the State had only a theory of what happened the night of Dabalos' murder. After he made his statement, the State had concrete information, but as Prosecutor Raz himself stated, that information would need to be evaluated before a charging decision could be made. The prosecutor's disclaimer was too equivocal to insulate the discussions from ER 410.
Other considerations that the trial court weighed against exclusion included the fact that Nowinski did not actually inquire about charging possibilities during the interview with the prosecutor, and did not establish the parameters of the interview before confessing. These considerations go to whether Nowinski sufficiently manifested his intent to negotiate before he inculpated himself.
The purpose underlying the rule is to encourage the disposition of criminal cases through plea bargaining by allowing an accused to participate candidly in plea discussions, without the fear that his plea or plea-related statements will be used against him at trial. State v. Jollo, 38 Wash.App. 469, 472, 685 P.2d 669 (1984). That policy is best served by requiring the accused to make manifest his intention to seek a plea bargain before taking the route to self-incrimination. See United States v. Levy, 578 F.2d 896, 901 (2nd Cir.1978) ("A silent hope, if uncommunicated, gives the officer or prosecutor no chance to reject a confession he did not seek."). But here, the undisputed facts establish that Nowinski clearly manifested to the detectives his desire to seek a "deal." Objectively, there was no reason for the prosecutor to join the discussion unless he was going to initiate plea negotiations. It will not do to rationalize the prosecutor's presence as necessary to answer Nowinski's questions about charging possibilities. It would not have been objectively reasonable for Nowinski to believe the prosecutor was there to give him legal advice.
The trial court's oral ruling indicates that the court was looking at the issue of objective reasonableness as "a judge with a lawyer's perspective on what was actually happening".[17] Considering the question from the perspective of an ordinary person better suits the policy of the rule, as it prevents plea bargaining from being used as a trap for the unwary. See United States v. Geders, 566 F.2d 1227, 1230 (5th Cir.1978), vacated on other grounds, 585 F.2d 1303; cert. denied, 441 U.S. 922, 99 S.Ct. 2031, 60 L.Ed.2d 396 (1979). Whether statements are made during the plea bargaining process is not to be determined according to "hypertechnical distinctions". Geders, 566 F.2d at 1230. "The government's contention that plea bargaining has not commenced is to be evaluated according to the standard of `caveat prosecutor'". Geders, 566 F.2d at 1230-31.
Nowinski manifested his desire to make a deal "so he wouldn't have to go to jail for a long time."[18] The police called in the prosecutor. The prosecutor did not disabuse Nowinski of his expectation that a deal would be offered, but merely commented that no deal would be made "that night". From the perspective of an ordinary person, these circumstances made it objectively reasonable for Nowinski to believe that he was engaged in plea negotiations.
To summarize, the trial court correctly determined that the presence of Prosecutor Raz made ER 410 potentially applicable, and appropriately analyzed the issue by means of the two-tiered Robertson test. It is undisputed that Nowinski subjectively expected that he was engaging in plea negotiations. We reverse the court's conclusion that his expectation was not objectively reasonable. We conclude that the trial court erred when it determined that ER 410 was inapplicable. Nowinski's statement should have been suppressed.
*847 The State acknowledges that Nowinski's actions and statements directing the detectives to locations of physical evidence "was a continuation of the appellant's decision to cooperate with the detectives and provide a statement."[19] The State accordingly concedes that suppression of his statement also compels suppression of these acts. We accept this concession.
Our disposition of the ER 410 issue makes it unnecessary to consider Nowinski's additional argument for suppression on the basis that his confession was involuntary.
Below, Nowinski moved unsuccessfully not only for suppression but also for dismissal of the prosecution under CrR 8.3(b). He argued that the police had circumvented his right to counsel by proceeding on the refiled robbery charge, in which Nowinski had been represented before that charge was dismissed.[20] Nowinski does not renew this argument on appeal. Instead, he argues that the prosecutor violated his professional responsibility to avoid conflicts of interest when he purported to answer Nowinski's "legal questions." According to Nowinski, this was misconduct so severe as to warrant the remedy of outright dismissal under CrR 8.3(b). This argument, because not made below, will not be considered as a basis for dismissal.
Related to the conflict of interest argument, Nowinski assigns error to the court's finding that Nowinski did not request counsel during the interrogation. He contends that when he told Detective Doyon that he wanted answers to his legal questions about the charging possibilities, that statement should have been recognized as a request for counsel.
Substantial evidence supports the finding that Nowinski did not make a request for counsel while in custody. At several points in the interrogation he was advised of his right to counsel, and there was no testimony that he ever asked for counsel. The argument that Nowinski implicitly invoked his right to counsel when he acquiesced to the detective's offer to call in the prosecutor was not raised below, and we will not consider it for the first time on appeal.
The motion to suppress should have been granted. The motion to dismiss was properly denied. The conviction is reversed.
APPELWICK and COLEMAN, JJ., concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] Findings and Conclusions on Defense Motions to Suppress, Finding of fact 7, Clerk's Papers at 228.
[3] Verbatim Report of Proceedings, 5/17/2001 at 25-26.
[4] Washington Rules of Evidence, Rule 410.
[5] Findings and Conclusions, Conclusion of law 3, Clerk's Papers at 232.
[6] Findings and Conclusions, Conclusion of law 2, Clerk's Papers at 232.
[7] Findings and Conclusions, Finding of fact 5, Clerk's Papers at 227.
[8] Findings and Conclusions, Finding of fact 6, Clerk's Papers at 227.
[9] Findings and Conclusions, Finding of fact 9, Clerk's Papers 228.
[10] Findings and Conclusions, Finding of fact 9, Clerk's Papers at 228-229.
[11] Findings and Conclusions, Finding of fact 11, in part, Clerk's Papers at 229-30.
[12] Findings and Conclusions, Finding of fact 12, in part; Clerk's Papers at 230-31.
[13] Findings and Conclusions, Conclusion of law 2, Clerk's Papers at 232.
[14] Findings and Conclusions on Defense Motions to Suppress, Conclusion of law 2, Clerk's Papers at 232.
[15] Findings and Conclusions on Defense Motions to Suppress, Finding of fact 11, Clerk's Papers at 229.
[16] Verbatim Report of Proceedings, 5/17/2001 at 57.
[17] Verbatim Report of Proceedings, 6/11/2001 at 13.
[18] Findings and Conclusions, Finding of fact 10, Clerk's Papers at 229.
[19] Brief of Respondent at 29.
[20] Verbatim Report of Proceedings, 6/7/2001 at 148-98; Clerk's Papers at 67-68.